Good morning, honorable panel. It's my pleasure to be here. Thank you for granting oral argument in this case, Johnson v. Eldor. This is a matter coming from the Western District of Virginia. This is an FLSA retaliation matter. This is a matter that was dismissed on summary judgment by the district court, and the district court highlighted the manager's rule in doing so. The manager's rule is an issue that we're going to be discussing today in the panel, and it is a rule that has come – there's a movement of, I should say, disfavor across the country related to the manager's rule. The Ninth Circuit dismissed it entirely. The masters took it away from Title VII in 2015. Can I back up a little bit? Yes, ma'am. Did the appellant ever specifically invoke the FLSA to appellee? Did the appellant – the appellant satisfied the report of a complaint regarding FLSA activities under Kasten. The appellant never used the letters FLSA in raising any issues. So how – what's your best argument as to how appellant put the appellee on notice that there was an FLSA issue?  There is no requirement that the appellant actually utter those letters. Okay, but if he didn't, so what is it? What's your best argument? Sure. December – excuse me. November of 2018, one month prior to the termination, he reported to the plant manager, Fabio Piscone, and Human Resources that, as his testimony said, I brought up to Fabio Piscone that I found the legality in Virginia being you can't work a non-engineer over 40 hours without some compensation. That is what was characterized in that meeting. There was then an additional protected activity. How many non-engineers were on his team? I'm sorry, I don't have that information right this second, Your Honor. I think it was less than 10. Because everything else we hear is him talking about, like, his engineer's work.  He's not talking about his own overtime. That is clear. He's not talking about a compensation owed to him. Or Wilkinson or the other folks that we see on his team that he does talk about. He's talking about employees – he's not a lawyer, but he's talking about employees that it's under his understanding, under Virginia law, as he said in his email to Giovanni Scaffidi, that they were owed additional compensation for working more than 40 hours. Virginia law follows and tracks the FLSA. It mentions it by statute. It says in the statute for the Minimum Wage Overtime Act. So from the perspective of the Supreme Court and other precedent, the plaintiff did engage in protected activities without consideration of the manager's role. It's the appellant's position that the appellant absolutely engaged in protected activities under this law. Now, it's the appellant's position that the manager's role should be disregarded. The protected activity that you suggest is that it gave fair notice that he was filing a complaint about the failure to comply with the FLSA. Yes, Your Honor. Under casting, filing a complaint can be a verbal communication from someone to management. The key part of that is fair notice, right? Right. Correct. This isn't about trying to get bonuses or time off or other things. It has to be – you need to be paying them time and a half. Correct. Well, he never said time and a half, but he did say additional compensation for more than 40 hours of work for these workers. And that's the overtime law. That mirrors the state law. It mirrors the federal law. So can you respond to that? Do you respect – like, no, the things that he says suggest that, right? They're all ideas that he's given to kick in at 50 hours or 60 hours or when they come in on holidays, they get, you know, extra time off or the like. All of those things suggest that his complaint is that my exempt employees need to get, like, a little more juice, right? So everything else he says is about my exempt employees getting a little more juice, right? I don't want to oversimplify, but that's the basic premise, right? Respectfully, Your Honor, I appreciate the way you're summarizing it. I would argue that it wasn't – it wouldn't be put in that description. Okay, well, hypothetically accept that everything else he says is I want my exempt employees to get more juice. Like, how do I read this one sentence, which I take as your argument, this is my best sentence. Right. How do I read that out of the rest of this context? Right. When I'm looking at a cast and fair notice question. Right. Thank you, Your Honor. The other information contained within his communications doesn't seemingly overcrowd, obfuscate, or block or otherwise omit what he has already said. I'm unfamiliar with a case – When we're looking at notice, it does sort of dilute or confuse the issue. It doesn't provide – and especially fair notice. It doesn't provide fair notice to the employer when he's proposing solutions that aren't time and a half pay, but are bonuses or other incentives that kick in at 50 to 60 hours. How are they – how is that fair notice of an FSO, whatever it is? FSA. Yes. Thank you, Your Honor.  Good point. I'd say that in response to that, you know, in order to provide – again, the plaintiff, the appellant is not an attorney. And the appellant's understanding of what could solve the problem, what solutions might be available, what remedies are not truly germane to a protected activity when it's already been made. When he's trying, when he's offering solutions, when he's talking about things that could remedy the problem, that doesn't eliminate the fact that he highlighted the problem itself. The problem itself being these people are not being paid 40 hours. May I talk a little bit about the manager's rule? Let me ask you a quick question about that real quick, though. Doesn't – and I'm going to mispronounce the last name – Scafidi, doesn't he testify in his deposition, I think it's JA-1010, that Johnson is – that his interpretation is that Johnson is emailing him regarding workers needing to be paid overtime? Yes. All right. So he acknowledges that they – so if notice is an issue, he's acknowledged that he's been placed on notice that workers maybe should be paid overtime. I think that's JA-1010. Thank you, Your Honor. I'd like to thank you, Your Honor, for pointing that out. Regarding the manager's rule, can I just understand that? We understand Scafidi. So there are two interpretations of overtime there, right? One is the one that Mr. Johnson primarily talks about, which is like my guys need some juice because they're working too hard, right? And the other is the FLSA requires time and a half for any non-exempt employee that works over 40 hours, right? It seems like to me when I read Scafidi, he's talking about the piece that Johnson is talking about, which is pay my guys more because they're working. I understand overtime is necessary, but you need to give them extra pay or extra time off or something once they get to 50 or 60 hours. I'd argue that that back and forth highlights the fact that he did mention that overtime was an issue, was at issue. The fact that that is in communication, the fact that he is saying that. And don't forget, these are individuals. But exempt people and non-exempt people both can work overtime, right? My clerks are exempt, right?  So they don't get paid for overtime.  Right. But there's no doubt when they're in the office on Saturday, we would all refer to that as overtime, right? They're working overtime. Well, respectfully, the employer would not say that. Anybody else in the real world, right, would refer to them working overtime. Oh, perhaps in the common parlance. Yes, Your Honor. But, Your Honor, again, how many peels of this onion on a protected activity are we going to go for here? Because it's an individual who is not a lawyer repeatedly highlights these issues. Yes, there's other information that he characterizes along with it, but it doesn't eliminate the thrust of what he's highlighting. Now, the manager's rule says. For sure, there may be issues. It's just the question of whether those issues rise to the level of an FLSA complaint. Speaking of that, I want to ask you about something in your brief. You say on page three of your brief that appellant's complaints ultimately led to an FLSA collective action against FLE. And there's notably no JA cite for that. It was a separate matter. And appellee says that there's nothing in the record that indicates that's the case. That did occur, but I apologize for it not being in the record. There was a separate FLSA collective action against Eldor that I represented engineers on that was going contemporaneous to this case. That case was resolved and didn't result in an FLSA. So it's not this case? It is not this case, but Mr. Johnson provided information and evidence in that case. Okay. All right. So it is. But after his termination. Okay. And you really want to talk about the manager's role, even though we don't? You know, you see the masters that we are. You go ahead. I'm trying to read your thoughts, Your Honor. You go ahead. Oh, I'm interested in your thoughts on the manager's role. You go ahead. Thank you, Your Honor. You know, from our position, the manager's role should be disregarded. But even if this court were to embrace it for this case, he's followed through with the tightrope that he has to walk to maintain a claim. The manager's role says that he has to step outside of his position. He has to step outside of his role in order to engage in these protected activities. So you've got to look at the facts here. When he has in November the conversation with Piscone and Farmer, he's immediately given a performance improvement plan. He's given one with 60 days to improve his performance, and this is after he's never received any counseling, never received. When he received, they started regular meetings with him back in November of 2018 to improve his management. He contests that that's what that was, Your Honor. He contests that he yelled at Ms. Farmer on the plant floor back in September. He did speak with her. He contests that he did not raise his voice to the degree where. And that he refused to. And how important is to the degree in your sentence? Well, Your Honor, I think what was clear is that he was terminated in this case for this e-mail that he sent to Giovanni's Cathedral. That's why he was let go. It's his e-mail because he's given a performance improvement plan after this situation. That may be the ultimate straw. Right, but he's given the performance improvement plan after the situation with Farmer, and he's given 60 days to improve. And he sends an e-mail. So, which e-mail? Can I just make sure I understand? Which e-mail is it? The e-mail was December 11th, 2018, two days prior to his termination for Giovanni Scaffini. Quote, we are asking. And then that, I understand. I just want to make sure I understand. In that, your position is that you've alleged that Scone and others, I mean, they're not copied on that e-mail. Where did we find in the record that the people that fired him were aware of that December 11th e-mail? Well, Giovanni Scaffini admitted to receiving the e-mail, and it was clear. I know, he was fired by Scaffini, right? He was fired by Scaffini. Correct. Fired by Scone and Farmer. And Farmer, right. So, they gave him a 60-day period of time, those two people. I'm asking a very specific question. And I'm answering. I'm trying to. Apparently, I'm failing. But I'm really trying to, Your Honor. Did he finish with your question? No, I think he understands the question. Yes. So, the point is, is that when he's given a 60-day period of time to improve his work performance by Farmer and by Pascone, the people who decided to terminate him, he's not really given 60 days. He's given just a few days. And what happens in the interim… I understand that, and that's irrelevant. The question I have, maybe you didn't understand it. I thought you did, but maybe not. What is the evidence in the record that Pascone and or Farmer were aware of Johnson's December 11 email at the time he was fired? It's circumstantial. I'm trying to get to it. I'm trying to get to it. Is that the only thing that occurred between him getting the performance improvement plan, giving him 60 days to improve his performance… No, Wilkerson's email. …is sending… Wilkerson's email. Right. Like, that's the one we know they know about. Right. Right? He's ghostwriting them, probably, but that's a different problem. So, it's not the only thing, right? Because Wilkerson's email is on the 12th. But in the right most favorable to appellant on December 11, the email has some evidence, right? So, you said the only thing that happened, and that's false, right? Right. Because, obviously, Wilkerson's email happened, too. So, what evidence do you have? Pascone… It's my understanding that when he was terminated, Pascone picked up the email that he had sent to Scafidi, balled it up, and threw it on the table. Wilkerson's email. Wilkerson's. Probably, yeah, Wilkerson's email. But it was… So, the question is, how did they know about his email on the December 11? Your Honor, because it was the only thing that happened between Mr. Johnson and Eldor after he received the performance improvement plan from the individuals who decided that he should be terminated and receive that plan. It's circumstantial. I'm trying to answer your question the best I can. I understand. Okay? I understand. These are individuals who knew about Mr. Johnson. Mr. Johnson had created quite the uproar at this point. I understand your argument. Thank you. Okay. And you have some time in rebuttal. I do. All right. Well, then I shall reserve it at that point. All right. We have a question from Ms. McEfferty now. Good morning, Your Honors, and may it please the Court. This case is about a manager's claims that his employees felt overworked and deserved additional compensation or benefits. These claims are not protected activity under the Fair Labor Standards Act because they do not meet the standard articulated by the Supreme Court in Kasten against St. Gobain. Under Kasten, to fall within the anti-retaliation provision of the Act, a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for… At this stage, isn't there a dispute of fact over whether an appellee had fair notice of the FLSA complaint, given that an appellant says that he repeatedly told them that, and that, as Judge Benjamin pointed out, the one manager acknowledged that that was the complaint that was being made? No, because when those statements are read in context, they are not an assertion of rights. I can address the… What about Helms saying that he was continuously, Robert Helms, continuously complaining about overtime? So, in that deposition testimony, the word proper time is being used. Robert Helms wasn't present for any of the plaintiff's statements to upper management. He testified to that. This is all testimony about people saying they discussed overtime, which is met in its colloquial sense of long hours. Nobody reading the word… When they read or heard these words, meant I need to be paid time and a half for work in excess of 40 hours. I don't know if… I don't know if Kasten says that they have to say that. And Miner definitely says that he doesn't. Well, it has to provide fair notice, but it's an assertion of rights. Well, what about the Virginia when he discusses the… In November 2018, he expresses the concerns regarding the Virginia laws and the legality of them working the hours that they're working. Is that not enough from a non-attorney? That's not… It's not enough. Okay. And based on what? Both the nature of the statement itself and what he said afterwards. So, he is saying, I'm not sure if what we're doing is legal under Virginia laws in terms of the hours that these guys and ladies are working. Under what context are you taking that? That's correct. If they say, I'm not sure or we might be breaking the law, that's not an assertion of rights and a call for their protection. So, I just want to read the statement. And I'll back up a little bit. One thing I struggled with in preparing in this case is identifying the statements that the plaintiff claims amount to complaints. And I arrived at… There are three. One is the one the court is asking about. The other is the email on December 11, 2018. And the third is a statement that the district court addressed in its opinion. So, I'll move through each statement, but I'll start with the November 2018 statement. The statement is he claims that in the meeting he brought up that he found the legality in Virginia to be you can't work a non-engineer over 40 hours without some kind of compensation. He then described what he meant by some kind of compensation. And he proposed options. Options are the plaintiff's words. He proposed paying time and a half for work over 50 hours, adding to a flex time bank, or creating a four-hour minimum for a column. By using the word options to describe his compensation proposal and requesting benefits like flex time, the plaintiff communicated that the legal issue he identified could be addressed in a variety of ways and that paying a specific rate of compensation was not required. A reasonable employer who heard this statement would not conclude the plaintiff was asserting rights and calling and making a call for their protection. So, that's the November 2018 statement. The other key statement that the plaintiff relies on is the December 11, 2018 email. An employer would not understand this email as a complaint under the Act primarily because the plaintiff states in the email that his concern is with employee happiness. He begins the email by saying, I'm writing to inform you of the current situation and then explains, my concern is with employee expectations and employee happiness. That statement makes clear that the purpose of the email is to address employee's well-being. And if the court would like to follow along, I'm looking at page 190 of the appendix. An employer reading it would understand everything that follows with that purpose in mind. The plaintiff goes on to say that his team is being asked to work many hours of overtime without a hint of compensation. We are asking them to come in early, stay late, be on call, and run the line. As I have pointed out many times, overtime, staying late, all of these things are expected, but expected to come and go and not be steadily high. So, that's one of the statements the plaintiff relies upon. Reading that, overtime is being used in the colloquial sense of long hours or hours that one normally would not work. Coming in on a weekend or at night, something outside of their regular shift. He claims that just the word overtime itself signals he was trying to say that his employer needed to pay his employees time and a half for work in excess of 40 hours. Would that, I mean, maybe not for those of us with legal minds, but overtime, I would think most people would think, right? If you say overtime, they're going to get paid for overtime? No, I disagree with that. I think overtime in the ordinary sense is long hours, hard work, more than you should be doing. It doesn't necessarily mean anything about pay. And, I mean, the entire thrust of the statement is that they deserve more pay, not that they're legally required to get it. And I think, weren't the employees that he hired exempt from overtime? That's correct. He testified to that. That's correct. It's like the mind meld here. Is there any record that he was hiring or had a team that was with non-exempt employees? Not that I know of. So that strikes me as an odd line for him to be drawing, right? Because the record, at least as I see it, is unambiguous and that he was hiring engineers and he was an engineering team and that they were all exempt. And so that context seems to matter to me. That context matters. I would love to argue it's dispositive. But still, it would be theoretically possible for him to make a statement that nonetheless put his employer on notice. Of course he could. He could say, you know, Bob Smith's team over here of employees are working overtime and that's against Virginia law. Do something about it. That makes sense to me. But we sort of look at these things in context as to what fair notice would provide. That's correct. And it says quite a bit about what the plaintiff could have been communicating. If he knows his employees are exempt, it makes it very difficult for him to also believe there's a violation of the Fair Labor Standards Act and that he's communicating that by his statements. Can I ask? Your colleague wanted to talk about it and maybe he will on reply, but the manager's rule and all these manager's rule cases sort of predate Kasten. Can you tell me why I don't think about the manager's rule as it's formulated as really a way to understand Kasten? Kasten itself is just saying you got to have fair notice and fair notice looks a little bit different when you're getting information from an HR director than it is if you're getting it from a line employee. The fair notice standard of Kasten eliminates the need to really talk about the manager's rule because it's not a standalone rule. It's just part of this idea of what would provide fair notice in an objective sense. I believe I agree with this. I view the manager's rule as a context-specific application of the Kasten standard to managers. It explains how a manager provides fair notice of a complaint under the act when the conduct that they claim is protected is part of their ordinary job duties. Because in those circumstances, if you're saying that something you ordinarily do is protected, it's impossible for that to provide fair notice. Explain how it's workable because I think that was some of the concern in Damascus. How is the manager's rule workable? Give me an example of how it works for the manager to step out of the role and make this complaint. In Damascus, this court expressly left open whether the manager's rule would apply in the fair labor standards context. What would it look like to step outside of the role? Something that makes clear they are no longer performing their job duties and what they are doing is trying to assert a complaint about a violation of rights. It really would have to be pretty clear. How would they do that? They would have to say, I am now stepping out of my job duties and asserting a complaint. They could say, I don't think the company is doing enough about this and I'm going to contact the Department of Labor. They wouldn't have to do that much. Imagine an HR director. An HR director says, my law clerk, Alan, he's complaining. An HR director says, Alan says that he's complaining about his overtime. She's just conveying information. She's not asserting a violation. The same HR director might instead turn around and be like, Alan is asserting this problem and I think you're violating the Fair Labor Standards Act and you need to do something about it. So the first one is sort of in her role as the HR director. And the second one is an assertion of a right. I'm not just reporting what's happening here. I'm not providing information. I now have become, in essence, an advocate as to the action. In those instances, you would agree the latter instance would be an FLSA assertion and the former would not be. That's correct. And that's cast in regardless of whether we really look at the quote unquote manager's rule, which all of those cases predate casting. That's correct. The other thing that's important to note about the manager's rule is that it was a secondary basis for the district court's decision to grant summary judgment. The district court wrote a 25-page opinion. Only two to three pages are on the manager's rule. So even if this court disagrees with everything that the court said about the manager's rule, it should still affirm because the statements do not provide fair notice. And I'm going to move back to the email because, as I understand it, there's three statements that the plaintiff plans or complains. Can you talk about this graffiti testimony that Judge Benjamin mentioned that he understood Johnson to be emailing about paying overtime? Yes. And two questions about it maybe in sort of context. One, does his subjective view matter or is this under casting just an objective inquiry? And then two, how am I supposed to understand that testimony? It's an objective standard, so it's what a reasonable employer would understand. Potentially, a subjective view could militate one way or the other. If someone subjectively doesn't understand it that way, it could suggest objectively it just doesn't mean that. But, yeah, I would like to— And where was Graffiti located? He resides in Italy. He is the chief operating officer of Eldor's Parent Company. So the testimony that was referenced— But he's referencing the email he got, right? This is the line of questioning. It's on Joint Appendix 1010. And this is a question from counsel. Okay, December 11th. Now, in the second paragraph of this email, there's a sentence, and I'm going to read it to you. It's about midway through. I heard you read it. It says, Do you see that? Mr. Scappitti answers yes. Okay, so isn't Mr. Johnson reporting to you that there are workers who maybe should be paid overtime but weren't being paid overtime? And the answer is, in this mail, yes. It's asking—we are asking men to work many hours of overtime without a hint of compensation. Yes, his summation of that people working, yes. You know, that time. That's disjointed because that's how the answer was. So even just looking at the question, who maybe should be paid overtime, there needs to be an assertion of rights and a call for their protection. If it's a question of maybe, it doesn't qualify as a complaint. And really, what Mr. Scappitti is doing, he's just agreeing that the email contains that sentence, if you look at his answer. He's not saying that he understood it as meaning that there was a legally required rate of pay that needed to be given to certain employees. But in terms of notice. Right. Okay, so Matt also would not get notice. Overtime in Matt's sentence is being used in the colloquial sense. That's in the second paragraph of the December 2011 email. Can I pause you a second before you turn to that email? I asked your counsel about this, or your colleague, and I'll ask you too. Is there any evidence in the record that Johnson's December 11 email was made known to Piscone or Farmer before he was fired? Not that I know of. And is there any evidence that Scappitti ordered Piscone or Farmer to fire him? Piscone and Farmer were the individuals who fired him. That's correct. Not Scappitti. Correct. And so to consider whether this was, you know, protected activity that would cause something, don't we have to have some evidence, the plaintiff has to report some evidence that the decision maker was aware of this? I mean, if Scappitti knew about it, but the decision maker here, Piscone slash Farmer, did not know about it, then it cannot have been the reason for his firing, right? I agree with that. I mean, it goes to a separate element of the main question here is did he engage in protected conduct, and that's really a causation argument, but we completely agree with all of that. Right, but we have to look at, I mean, it's hard to look at those totally separately, right? I mean, nobody would make the argument, or I think nobody would make the argument, the fact that he told his wife about this, that that's protected activity, right? So if he didn't tell the decision maker, we shouldn't consider it, right? That's correct. But it sounds like there's a lot of concern about whether this use of overtime could potentially put an employer on notice, and this is in the December 11th email. So after he makes these statements about overtime, the next paragraph he writes, if at all possible, I need some measure of relief for the group. Before you left, we met regarding a compensation idea I proposed. No movement has been made regarding this idea. I need this or something like it to be a priority to succeed at my job. That's what follows the statements about my employers are working overtime. What is this document on JA 707 to 708? It's Exhibit 34 to one of the depositions. It starts out, Elder has been poorly staffed until recently, and I think it's described in one of the briefs as something that appellant wrote after the fact, documenting everything that occurred. I don't have that specific document handy, but that's great. After everything occurred, there's no dispute that Elder was understaffed. I know you don't have it in front of you, but this document, if you're familiar with it, it's something that appellant wrote. He wrote a summary of the reasons he was terminated. Because I'm looking at that summary of the reasons he was terminated and the suggestions and things he made, and all of the suggestions he made seemed to kick in after they worked 60 hours, which would not, even in his own words, after the fact, indicate that this is an overtime FLSA issue. Correct?  To conclude, the district court correctly granted summary judgment because the plaintiff never engaged in protected activities. He complained that his team was overworked and felt taken advantage of, but he never engaged in conduct that amounted to the filing of a complaint under the Fair Labor Standards Act. For that reason, Elder respectfully requests that the court affirm the judgment of the plaintiff. I have 30 seconds. I'll answer any other questions. I don't think we have any. Thank you. We'll hear from Mr. Strelka again. Thank you, Your Honor. I'll start with Judge Thacker's question, which I paraphrase to say, where in the record can I look to find that Johnson's team employed a non-exempt non-engineer?  So, first off, the issue of where in the record I should look and then explain whatever you want me to look. That issue is not clearly – I don't have that information right at my fingertips. I would like to talk about it, though. And the reason is because the issue of whether these, quote, engineers should have been even exempt or not was a key issue at the time. There were individuals that were called engineers by management who, under, again, a lawyer's perspective of analysis of all of the information. This is what the other lawsuit – Let me ask it more precisely. Is there anything in the record, just that you can tell me about, I can get somebody to find it in the records since you don't have it, that he hired and his team were non-engineers? It was the plaintiff's position that these individuals were owed overtime. It is – I'm asking a very specific question, and if you could help me – It's not in the record. If you don't want to help me, that's totally fine. It's not in the record, but the court may make an incorrect assumption that just because the employer says that they are exempt – I'm sorry, it's not in the record. So what you're saying is you agree that, at least as far as the record goes, that his team was entirely made of engineers. Correct, but this was not a determinative issue. He testified that the people that he hired were exempt from the FLSA. According to the documentation from Eldor. According to how they classified them. According to his testimony. Right, but he was mirroring what was told to him about these workers. Did he say that in his testimony? No, but this – Okay, all right. Well then, let's get back to the record. Right. The issue about whether those workers were exempt or non-exempt was not a determinative issue at the district court level. It wasn't. And one of the reasons for that is because when an employee – It wasn't a determinative – I don't understand that. What is it? The issue that you've highlighted, Your Honor, the fact that he's working with these workers who are engineers, whether they are exempt or non-exempt, is irrelevant to whether or not he engaged in a protected activity in this case. That's what I'm saying. It is. It strictly is. Because it – I understand that argument. I just want to make sure I understood the record because I thought the first time you were up, I asked you about this question. All right. And you suggested to me that he had employees on his team. Right. Your Honor, he did. Again, this is a separate lawsuit. Again, it's not on the record. Not on the record, Your Honor. I don't want to hear it if it's not on the record. All right, well then – But the issue of whether these engineers were exempt or not was something that was litigated. You wrote in your brief that his complaint led to a separate FLSA corrective. Post his termination. Right. But with no JA site there either. It's just a reference to it, Your Honor. Uh-huh. There's something important, Judge Richardson, I want to circle back to you about the notice issue with Scafidi.  If you take that entire – don't take it out of context. Just say that Scafidi never had notice or that Scafidi never talked to Piscone and Farmer. Let's say that. Let's assume that. Let's assume Scafidi gets this email. December 11th email. December 11th email. Okay. He reads it. It may have some overtime stuff in it. It may be protected. It may be not. But in this hypothetical that I'm presenting, he doesn't present this information to Piscone or Farmer. Okay? He still has an FLSA retaliation case because one month earlier, he did highlight protected acts to Farmer and Piscone in November. And due to temporal proximity, even if the whole thing regarding Scafidi is thrown into the trash. The question is just whether – right? The question is whether we consider the November – the December 11th email or not. Right. Right. It's not – I understand that you have an argument about the October-November testimony that he says that he said.  Right? But we're trying to look at the pieces of the puzzle.  And your suggestion that this is all about the email of December 11th seems belied by the record. My point I'd like to make now, Your Honor, is that if the court is of the mind that that – there's no evidence tying that email to the decision-makers, it's not needed. Because those same decision-makers were in the room with the plaintiff, the appellant, when they heard his protected activity one month before they decided to terminate him. Under every single precedent that this court has regarding temporal proximity, he satisfies it. But then it's only about the meeting. Right? Then we have to gather fair notice from the meeting alone, which you can.  And – Then how is that fair notice from the meeting? The November meeting, not – Because in the meeting, as according to his testimony, the right, most favorable plaintiff, I brought up to Fabio Piscone that I'd found the legality in Virginia being you can't work a non-engineer over 40 hours without some compensation. That's what he said in the meeting one month prior to his termination and just days before he – these same individuals gave him a performance improvement plan, telling him he had two months to fix it, and then they didn't give him the two months. So I think circumstantially, the right, most favorable to appellant, the fact that he sends an email to the highest person that he knows in the company, of an Italian company in Italy, I think it'd be unusual for that person not to communicate that back to his U.S. managers. But, again, I don't have the evidence of that email. You know, it is what it is. But thank you for your time. We ask that the court reverse the lower court's decision. Absent the question of law related to the manager's role, a reasonable jury could find that this individual engaged in protected activities, that they knew it, and they retaliated against them. Thank you. Thank you. We'll come down in Greek Council and then take a brief recess. This honorable court will take a brief recess.
judges: Stephanie D. Thacker, Julius N. Richardson, DeAndrea Gist Benjamin